

Honorable Mike K. Nakagawa
United States Bankruptcy Judge

Entered on Docket
June 01, 2018

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

* * * * * *

| | |
|---|---|
| In re: | Case No. 10-28345-MKN |
| | Chapter 7 |
| RAFAEL MIRCHOU dba ALEXA PROFESSIONAL PLAZA, LLC, | |
| | Date: May 16, 2018 |
| Debtor. | Time: 2:30 p.m. |

**ORDER ON MOTION TO REOPEN BANKRUPTCY CASE
PURSUANT TO FEDERAL RULE OF BANKRUPTCY 5010[1]**

On May 16, 2018, the court heard the Motion to Reopen Bankruptcy Case Pursuant to Federal Rule of Bankruptcy 5010 ("Motion"). The appearances of counsel were noted on the record. After arguments were presented, the matter was taken under submission.

**BACKGROUND**

On September 28, 2010, a voluntary Chapter 11 petition was filed by Rafael Mirchou dba Alexa Professional Plaza, LLC ("Debtor"). (ECF No. 1).

On October 14, 2010, a proof of claim in the amount of $489,543.73 was filed by Real Time Resolutions, Inc. ("Real Time"), secured by property located at 2021 S. Valadez Street, Las Vegas, Nevada 89117. That proof of claim ("Real Time POC") specifies that notices in connection with the creditor should be sent to: Agent for BAC (fka Countrywide), 1750 Regal

---

[1] In this Order, all references to "ECF No." are to the numbers assigned to the documents filed in the case as they appear on the docket maintained by the clerk of the court. All references to "Section" are to the provisions of the Bankruptcy Code, 11 U.S.C. §§ 101-1532. All references to "FRBP" are to the Federal Rules of Bankruptcy Procedure. All references to "FRCP" are to the Federal Rules of Civil Procedure. All references to "Local Rule" are to the Local Rules of Bankruptcy Practice for the District of Nevada.

Row, Suite 120, Dallas, TX 75235.  Attached to the Real Time POC are copies of a Home Equity Credit Line Agreement and Disclosure Statement dated June 8, 2006, in the amount of $450,000, as well as a Deed of Trust of the same date, recorded on June 14, 2006 ("Real Time DOT").

On October 28, 2010, a request for special notice was filed on behalf of Wachovia Bank, N.A.  (ECF No. 20).

On November 2, 2010, a request for special notice was filed on behalf of BAC Home Loans Servicing LP.  (ECF No. 21).

On November 30, 2010, Debtor filed his schedules of assets and liabilities ("Schedules") along with his statement of financial affairs ("SOFA").  (ECF No. 25).  On his real property Schedule "A," Debtor listed a property located at 2021 S. Valdez[2] Street, Las Vegas, Nevada 89117 ("Valadez Property").  On his secured creditor Schedule "D," Debtor listed Wachovia as having a claim in the amount of $1,443,387 secured by a first mortgage against the Valadez Property.  Debtor also listed Real Time as having a claim in the amount of $495,975.51,[3] secured by the Valadez Property.  Debtor also listed the value of the Valadez Property as $1,745,500, which was the same value shown for the same property on his Schedule "A."

On December 9, 2010, a request for special notice was filed on behalf of Wells Fargo Bank, N.A., aka Wachovia Mortgage, etc. ("Wells Fargo").  (ECF No. 31).  On the same date, Wells Fargo filed a proof of claim in the amount of $1,498,741.88, secured by the Valadez Property.  The proof of claim specifies that notices in connection with the creditor should be sent to: Pite Duncan, LLP, 4375 Jutland Drive, Suite 200, P.O. Box 17933, San Diego, California 92177-0933.

On December 13, 2010, a request for special notice was filed on behalf of The Bank of

---

[2] On the Schedules, the street name is spelled "Valdez," but on the copies of the deeds of trust filed in this case, the street name is spelled "Valadez."

[3] As previously mentioned, the Real Time POC was in the amount of $489,543.73, and was filed before the Debtor filed his Schedules.  The claims register prepared by the court clerk reflects the amount shown on the Schedules rather than the Real Time POC.  The amount set forth in the Real Time POC, submitted under penalty of perjury, controls over the amount listed on the claims register.

New York Mellon fka The Bank of New York, as Trustee for the Certificateholders of Cwalt, Inc., Alternative Loan Trust 2006-OA16, Mortgage Pass-Through Certificates, Series 2006-OA16.  (ECF No. 32).

On February 22, 2011, a request for special notice was filed on behalf of Ascension Capital Group, Inc., regarding BMW Financial Services NA, LLC.  (ECF No. 56).

On March 18, 2011, after obtaining substitute bankruptcy counsel,[4] Debtor filed amended Schedules (ECF No. 71) and an amended SOFA (ECF No. 72).  On amended Schedules "A" and "D," the value of the Valadez Property was shown as $1,200,000, rather than $1,745,500.[5]  On amended Schedule "D," Wells Fargo was listed as having a claim in the amount of $1,498,741.88 secured by a first mortgage against the Valadez Property.  Bank of America was listed as having a claim in the amount of $459,860 secured by a second mortgage against the Valadez Property.  Debtor also listed Real Time as having a claim in the amount of $449,861, secured by a second mortgage against the Valadez Property.

On October 6, 2011, a request for special notice was filed on behalf of Bank of America, N.A., Successor by Merger to BAC Home Loans Servicing, LP.  (ECF No. 145).

On December 13, 2011, Debtor filed a Disclosure Statement ("DS"), Exhibit "A" to which is a proposed Chapter 11 plan of reorganization ("Proposed Plan").  (ECF No. 167).  The DS states that under Class 1a of the Proposed Plan, the claim of Wells Fargo will be deemed fully secured, but that the Valadez Property will be sold through a court-approved short sale. See DS at 7:10-15.  The Proposed Plan similarly indicates that in Class 1(a), the Valadez Property will be subject to a short sale, but that any unsecured portion of Wells Fargo's claim would be treated as an unsecured claim in Class 5 (which did not exist in the proposed plan). See Proposed Plan at 2:9-19.

On December 23, 2011, Debtor filed a motion to sell the Valadez Property ("Valadez

---

[4] On March 18, 2011, an order was entered approving the substitution of bankruptcy counsel.  (ECF No. 66).

[5] Amended Schedule "A" indicates that the Valadez Property is held "in the name of Villa Roma Trust."  Debtor's relationship to the Villa Roma Trust is not specified.

Sale Motion") to a buyer identified as Jaldeep Daulat ("Daulat"). (ECF No. 168). The motion was noticed to be heard on January 25, 2012. (ECF No. 170). On the same date, Debtor filed a motion to employ a real estate broker for the sale to Daulat. (ECF No. 172). The latter motion also was noticed to be heard on January 25, 2012. (ECF No. 174).

On January 11, 2012, opposition to the Valadez Sale Motion was filed by the Debtor's estranged spouse, as well as by Wells Fargo. (ECF Nos. 178 and 179).

On January 23, 2012, Debtor filed a reply in support of the Valadez Sale Motion. (ECF No. 181).

On January 25, 2012, the Valadez Sale Motion was heard by the assigned bankruptcy judge who denied the motion, but granted the Debtor permission to sell the Debtor's interest in the Valadez Property. Debtor's bankruptcy counsel, however, did not submit a written order memorializing the court's ruling on the Valadez Sale Motion.

On August 10, 2012, Debtor filed a Motion to Value Collateral, "Strip Off" and Modify Rights of Secured Creditors Pursuant to 11 U.S.C. § 506(a) and §1123 ("Valuation Motion"). (ECF No. 220).[6] A notice of hearing on the Valuation Motion ("Hearing Notice") was filed specifying that the matter would be heard on September 12, 2012. (ECF No. 221). A certificate of service was filed by the Debtor's counsel ("Service Certificate") attesting that the Valuation Motion and Hearing Notice were electronically transmitted to counsel for various parties, were served by certified mail on Wells Fargo, and were served by first class mail on counsel for various entities.[7] (ECF No. 226).

---

[6] Attached as Exhibit "3" to the Valuation Motion is a proposed order granting the request, the last page of which includes the certification required by Local Rule 9021. Local Rule 9021(c) requires counsel to certify that a proposed order submitted to the court accurately reflects the court's ruling. The proposed order attached to the Valuation Motion already had the space checked for counsel's certification that "No party appeared at the hearing or filed an objection to the motion." Checking that space before a hearing is even conducted obviously is improper. Moreover, a party's failure to appear at a hearing or to file an objection, of course, assumes that the party actually had notice of the hearing on the subject motion.

[7] The entities served by mail include BAC Home Loans Servicing LP and Ascension Capital Group, Inc. On amended Schedule "D," Debtor listed BAC Home Loans Servicing as a secured creditor with respect to real estate other than the Valadez Property. As previously

On August 29, 2012, Debtor filed a First Amended Disclosure Statement ("FAD") to which was attached another proposed Chapter 11 plan of reorganization ("Second Proposed Plan"). (ECF No. 235). The FAD disclosed that the Valadez Property will be surrendered to the holder of the secured claim under Class 2(f) and any deficiency would be treated as unsecured debt. See FAD at 9:22-28. The attached plan similarly indicated that the Valadez Property would be surrendered and specified that Wells Fargo held the first mortgage. See Second Proposed Plan at 29:13-19. A notice was filed scheduling a hearing to approve the FAD for October 24, 2012. (ECF No. 237).

On September 13, 2012, an order was entered granting the Valuation Motion ("Valuation Order"). (ECF No. 240). The Valuation Order was prepared and submitted by Debtor's bankruptcy counsel. Attached to the Valuation Order is the same certification under Local Rule 9021(c) that was attached to the proposed order accompanying the Valuation Motion. See note 6, supra. In addition to granting the Valuation Motion, the order includes the following provisions:

> **ORDERED** that the [Valadez] Property is valued at NINE HUNDRED FIFTY THOUSAND DOLLARS AND ZERO CENTS ($950,000.00) and it is further
> **ORDERED** that REAL TIME RESOLUTIONS, INC., Account No. **xxxxx9392** (Second Mortgage and/or Second Deed of Trust) is avoided, "stripped off" and extinguished, as a wholly unsecured second lien pursuant to section 506(a) of the Bankruptcy Code and it is further
> **ORDERED** that REAL TIME RESOLUTIONS, INC., Account No. **xxxxx9392** (Second Mortgage and/or Second Deed of Trust) secured rights and/or lien-holder rights in the [Valadez] Property are hereby terminated; and it is further
> **ORDERED** that the Debtor must complete the Chapter 11 plan and receive a discharge or the full lien may be reinstated; and it is further
> **ORDERED** that as provided by Fed. R. Bankr. P. 7062, this Order shall be effective and enforceable immediately upon entry.

Valuation Order at 2:9-23.

On October 9, 2012, numerous objections to approval of the FAD were filed. (ECF Nos. 245, 247, and 248).

---

mentioned at 3, Ascension Capital had filed a request for special notice regarding BMW Financial Services NA, LLC. BMW Financial is not listed in the Debtor's creditor Schedules, but it filed a proof of claim on April 28, 2011, and an amended proof of claim on July 28, 2011, with respect to the Debtor's lease of a 2006 vehicle.

On October 31, 2012, an order was entered denying approval of the FAD.  (ECF No. 260).

On December 31, 2012, Debtor filed a Second Amended Disclosure Statement ("SAD") to which was attached another proposed Chapter 11 plan of reorganization ("Third Proposed Plan").  (ECF No. 267).[8]  The SAD states that the Valadez Property will be surrendered to the holder of the secured claim under Class 2(f) and any deficiency would be treated as unsecured debt.  See SAD at 11:9-16.  The attached plan similarly indicated that the Valadez Property would be surrendered and specified that Wells Fargo held the first mortgage.  It also specified that the unsecured portion of Wells Fargo's claim would be treated in unsecured Class 5.  See Third Proposed Plan at 31:9-16.[9]  Notices were filed scheduling a hearing to approve the SAD (as amended) for February 27, 2013.  (ECF Nos. 270 and 272).

On February 12, 2013, a motion for relief from stay was filed by Wells Fargo with respect to the Valadez Property.  (ECF No. 292).  A notice was filed scheduling a hearing for March 30, 2013.  (ECF No. 293).

On February 13 and February 16, 2013, objections to approval of the SAD were filed. (ECF Nos. 298 and 305).

On March 27, 2013, an order was entered granting Wells Fargo relief from stay with respect to the Valadez Property.  (ECF No. 317).

On August 1, 2013, the Office of the United States Trustee ("UST") filed a motion to dismiss the Chapter 11 proceeding ("Dismissal Motion").  (ECF No. 333).

On August 8, 2013, Debtor filed a Third Amended Disclosure Statement ("TAD") to which was attached another proposed Chapter 11 plan of reorganization ("Fourth Proposed Plan").  (ECF No. 344).  The TAD disclosed that the Valadez Property would be surrendered in some fashion under Class 1 to permit the Debtor's former wife to attempt to refinance or modify

---

[8] On January 2, 2013, Debtor filed an amended version of the SAD that included an additional attached exhibit.  (ECF No. 269).

[9] Both the SAD and Third Proposed Plan refer to a separate class of unsecured claims, but neither document creates such a class.

1  the loan.  <u>See</u> TAD at 8:6-20.  The attached plan similarly indicated that the Valadez Property

2  would be surrendered in some fashion, but represented that the Valadez Property had an

3  estimated value of $1,642,276.  Additionally, Debtor's proposed plan represented that there was

4  a second position lienholder that would have an unsecured claim of $150,972.63 treated along

5  with other unsecured creditors in Class 11.  <u>See</u> Fourth Proposed Plan at 31:5-14.

6          On August 9, 2013, the court entered an order denying the Debtor's request for

7  conditional approval of the TAD and to set an expedited hearing on confirmation of the Fourth

8  Proposed Plan.  (ECF No. 357).  Because the request for an expedited hearing was denied, the

9  hearing on disclosure statement approval was scheduled to be held on October 9, 2013.  (ECF

10  No. 360).

11          On August 12, 2013, the UST filed a notice scheduling a hearing on its Dismissal Motion

12  for October 9, 2013, i.e., the same date as the hearing on approval of the TAD.  (ECF No. 359).

13          On September 25, 2013, objections to approval of the TAD were filed by various parties.

14  (ECF Nos. 372, 375, 376, 377, and 378).

15          On October 9, 2013, the court concluded at the hearing that the Chapter 11 proceeding

16  should be converted to Chapter 7.  As a result, the court also denied approval of the TAD.

17          On October 18, 2013, the court entered an order converting the Chapter 11 proceeding to

18  a Chapter 7.  (ECF No. 397).  On the same date, a notice was issued informing parties in interest

19  that a meeting of creditors in the Chapter 7 proceeding would be held on November 18, 2013,

20  that a deadline to file proofs of claim in the Chapter 7 proceeding had been set for February 18,

21  2014, and that Brian D. Shapiro had been appointed as Chapter 7 trustee ("Trustee") to

22  administer the estate.  (ECF No. 399).

23          On October 22, 2013, an order was entered denying approval of the TAD.  (ECF No.

24  404).

25          On October 30, 2013, Debtor's bankruptcy counsel filed applications for approval of

26  final compensation for services rendered in the Chapter 11 case.  (ECF Nos. 408 and 410).

27  Notice of the applications and of the hearing date (ECF Nos. 409 and 411) was served on the

28  Debtor and all parties in interest.  (ECF Nos. 412 and 414).  The applications were granted by

orders entered on December 16, 2013 and December 23, 2013 ("Fee Orders"). (ECF Nos. 428 and 430).[10]

On January 13, 2014, Debtor filed his amended Schedules and SOFA ("Post-Conversion Schedules"). (ECF No. 431)

On January 30, 2014, the Trustee filed objections to exemptions that the Debtor claimed in his ownership interests in various entities ("Exemption Objection"). (ECF No. 454).

On March 12, 2014, an order was entered sustaining the Trustee's Exemption Objection. (ECF No. 473).

On June 4, 2014, Debtor received his Chapter 7 discharge. (ECF No. 497).

On January 12, 2016, the Trustee filed a Final Report ("TFR"). (ECF No. 525).

On July 13, 2016, the Trustee filed a Final Account and Distribution Report ("TDR"). (ECF No. 530).

On July 26, 2016, a "Final Decree" was entered discharging the Trustee and closing the case. (ECF No. 532).

On April 6, 2018, the instant Motion was filed on behalf of Real Time, along with RRA CP Opportunity Trust 1. (ECF No. 533).[11]  A notice of hearing was filed scheduling the Motion to be heard on May 16, 2018. (ECF No. 537).  A certificate of service was filed attesting that the notice of hearing was served by mail on counsel for "Plaintiff Jaldeep Daulat" as well as counsel for "Defendant Rafael Mirchou." (ECF No. 538).

On April 12, 2018, an opposition was filed on behalf of Daulat ("Opposition"). (ECF

---

[10] The res judicata effect of the Fee Orders might prevent the Debtor's assertion of any subsequent claims against his Chapter 11 counsel.  See, e.g., Grausz v. Englander, 321 F.3d 467, 473 (4th Cir. 2003) (bankruptcy court order approving fees for services rendered in Chapter 11 proceeding barred subsequent action for professional negligence).

[11] Attached to the Motion as Exhibit "1" is a copy of a Register of Actions ("State Docket") of a civil action pending in the Eighth Judicial District Court, Clark County, Nevada ("State Court"), styled as Jaldeep Daulat v. RRA CP Opportunity Trust 1, et al., denominated Case No. A-17-763408-C ("State Action").  Attached as Exhibit "2" is a copy of a motion for summary judgment filed by plaintiff Daulat ("Daulat MSJ"), that includes multiple exhibits.  Neither the exhibits attached to the Motion, nor to the Daulat MSJ, include a copy of the complaint in the State Action.

No. 540).[12]

On May 9, 2018, a reply was filed by on behalf of Real Time ("Reply").  (ECF No. 541).

**DISCUSSION**

Real Time seeks to reopen the Debtor's Chapter 7 proceeding under FRBP 5010 "in order to further administer the assets of the Bankruptcy Estate - specifically the [Valadez] Property and the [Real Time deed of trust]."  Motion at 3:5-6.  After the Debtor received his discharge, and acting as Trustee of the Villa Roma Trust, Debtor apparently sold the Valadez Property to Daulat in March 2016 without satisfying the lien under the Real Time DOT.  Id. at 4:20-26.

In October 2017, Daulat commenced the State Action apparently seeking declaratory relief to quiet title to the Valadez Property.  Daulat named Real Time as a defendant,[13] in addition to RRA CP Opportunity Trust 1, the Debtor, the Debtor's former wife, and the Villa Roma Trust.

In February 2018, the Daulat MSJ was filed, and the Real Time MSJ was filed the following month.  In connection with those proceedings, Daulat has asserted that the Real Time

---

[12] Attached to the Opposition as Exhibit "A" is another copy of the Daulat MSJ. Attached as Exhibit "B" is a copy of Real Time's opposition to the Daulat MSJ that includes Real Time's countermotion for summary judgment ("Real Time MSJ").  Attached as Exhibit "C" is a copy of Daulat's opposition to the Real Time MSJ.  Attached as Exhibit "D" is a copy of Daulat's reply in support of the Daulat MSJ.  Attached as Exhibit "E" is a copy of a Grant, Bargain, Sale Deed, recorded March 14, 2016, from the Debtor as Trustee of the Villa Roma Trust, transferring the Valadez Property to Daulat.  Attached as Exhibit "F" is a copy of Daulat's declaration in support of his opposition to the Real Time MSJ.  Attached as Exhibit "G" is a copy of the declaration of Sheree Edwards in support of Daulat's opposition to the Real Time MSJ.  Attached as Exhibit "H" is a copy of a Settlement Statement dated March 14, 2015, reflecting Daulat as the borrower and the Villa Roma Trust as the seller with respect to the Valadez Property, and a payoff of $1,361,782.24 going to Wells Fargo on its first mortgage. Attached as Exhibit "I" is a copy of a Deed of Reconveyance dated February 22, 2016, with respect to a deed of trust against the Valadez Property dated September  6, 2002, apparently in favor of the Medicare Fraud Control Unit of the Office of the Nevada Attorney General.

[13] According to the State Docket, Real Time is named in the action as Real Time Solutions rather than Real Time Resolutions.  It is not clear from the State Docket whether the name has been corrected, even though the proper name appears to be used in the summary judgment motions.

DOT against the Valadez Property was "stripped off" or otherwise voided as a result of the Valuation Order.[14] Real Time asserted that the result was conditioned on the Debtor obtaining a Chapter 11 discharge, which he failed to do.

On April 10, 2018, the State Court conducted an initial hearing on the summary judgment motions. The day before the hearing, however, Real Time apparently filed an emergency motion to stay the proceedings so that clarification of the Valuation Order could be sought from the bankruptcy court. The State Court granted the emergency motion and continued the summary judgment motions for a status check to be held on July 24, 2018.[15]

Real Time's instant Motion is brought under FRBP 5010 which permits a case to be reopened on the motion of a party in interest "pursuant to §350(b) of the Code." FED. R. BANKR. P. 5010. Under the latter statutory provision, a case may be reopened "to administer assets, to accord relief to the debtor, or for other cause." 11 U.S.C. § 350(b). The decision to reopen a case is committed to the discretion of the bankruptcy court, see, e.g., Elias v. U.S. Trustee (In re Elias), 188 F.3d 1160 (9th Cir. 1999) (denial of request to reopen dismissed Chapter 11 proceeding to address fee dispute between debtor and his bankruptcy counsel), and the court may reopen a case to protect its jurisdiction over its own orders. See, e.g., McGhan v. Rutz (In re McGhan), 288 F.3d 1172 (9th Cir. 2002) (reopening Chapter 7 required inasmuch as the state court lacked authority to modify the bankruptcy court order granting discharge and discharge injunction).

Daulat does not dispute that the interpretation of the Valuation Order is at the heart of the State Action. Instead, he argues that the State Court has concurrent jurisdiction to interpret the

---

[14] The benefit of stripping a lien is that if a lien or any portion of a lien is removed from property, the owner may sell the property, and the buyer may purchase the property, without having to satisfy or being subject to the lien. If the owner also has been discharged of any personal liability through bankruptcy, none of the sale proceeds can be claimed by the creditor whose lien was stripped.

[15] The State Docket attached to the Motion was printed on April 6, 2018. The court takes judicial notice of the docket in the State Action as of the date of this Order pursuant to FRE 201. See Bank of Am., N.A. v. CD-04, Inc. (In re Owner Mgmt. Serv., LLC Trustee Corps.), 530 B.R. 711, 717 (Bankr. C.D. Cal. 2015) ("The Court may consider the records in this case, the underlying bankruptcy case and public records.").

bankruptcy court's order and that Real Time's request to reopen the Chapter 7 proceeding therefore should be denied. See Opposition at 8:11 to 9:18. Even though Real Time does not seek relief from the Valuation Order under FRCP 60(b), Daulat also argues that relief under that rule is time barred. Id. at 7:1-28. More important, and notwithstanding his position that the State Court should interpret the Valuation Order, Daulat argues that the subject order actually resulted in the so-called "stripping" of Real Time's lien against the Valadez Property. Id. at 9:19 to 13:21.

The court, having considered the written and oral arguments of counsel, together with the record presented, concludes that the bankruptcy case should be reopened and that the Valuation Order did not result in the avoidance of the lien created by the Real Time DOT. The court reaches these conclusions for a number of reasons.

First, reopening the Chapter 7 case is appropriate for cause shown by both Real Time and Daulat. The court agrees with Daulat that reopening the case is not necessary to permit the Trustee to administer assets. See Id. at 8:1-10. There is no question that the Valadez Property was disclosed during the bankruptcy proceeding and that the Trustee had full knowledge of the asset. See TFR, Form 1, Ref. 5. Because the Trustee exercised his discretion not to liquidate the Valadez Property, any interest of the bankruptcy estate was administratively abandoned to the Debtor when the case was closed, see 11 U.S.C. § 554(c), and the Trustee has no further interest in this proceeding.[16]

The Debtor also does not oppose reopening the case. It appears that the Debtor was served with the instant Motion and has not filed written opposition, nor did he appear at the hearing to contest the relief requested. Debtor has received his Chapter 7 discharge, and reopening the case is not necessary to provide additional relief to the Debtor.

Both Daulat and Real Time, however, seek to apply the Valuation Order in their

---

[16] By contrast, if the Valadez Property had not been administered due to a failure to disclose it, it would not be abandoned upon closure of the case and would remain property of the bankruptcy estate. See 11 U.S.C. § 554(d). See Levesque v. Shapiro (In re Levesque), 473 B.R. 331, 336 (B.A.P. 9th Cir. 2012) (unscheduled personal injury claim remained property of Chapter 7 estate even after case was closed).

1    respective favor, and have repeated virtually all of the arguments raised before the State Court in

2    their summary judgment motions.[17]  Ordinarily, the bankruptcy court that enters an order is in the

3    best position to interpret its meaning.  See Taylor v. Axion Power Int'l (In re Mega-C Power

4    Corp.), 2010 WL 6467668, at *8 (B.A.P. 9th Cir. 2010).  See also Officers for Justice v. Civil

5    Serv. Comm'n of City and Cnty. of San Francisco, 934 F.2d 1092, 1094 (9th Cir. 1991) ("[W]e

6    give deference to the district court's interpretation based on the court's extensive oversight of the

7    [consent] decree from the commencement of the litigation to the current appeal"); Brown v.

8    Neeb, 644 F.3d 551, 558 n.12 (6th Cir. 1981) ("Few persons are in a better position to

9    understand the meaning of a consent decree than the district judge who oversaw and approved

10    it.").  Because the State Court stayed further proceedings on the parties' summary judgment

11    motions, the bankruptcy court concludes that reopening the bankruptcy case is appropriate.

12    Second, relief from the Valuation Order under FRCP 60(b) is neither requested by Real

13    Time, nor required in this case.  Real Time and Daulat have not requested changes in the

14    language of the Valuation Order, but only an interpretation that favors their respective legal

15    positions.  As a result, the deadlines for seeking relief from an order prescribed by FRCP 60(c)

16    simply do not apply.

17    Third, the record is unclear whether the Valuation Motion that resulted in the Valuation

18    Order was ever served on Real Time.  The Real Time POC specified that notices in connection

19    with its claim were to be sent to a specific address in Dallas, Texas.  There is nothing in the

20    record indicating that a request for special notice was filed in the case by any attorneys on behalf

21    of Real Time.  The Service Certificate supporting the Valuation Motion evidences only that

22    Wells Fargo was served by certified mail, that two entities other than Real Time (BAC Home

23    Loan Servicing LP and Ascension Capital Group) were served by regular mail, that six law firms

24    that previously entered appearances on behalf of entities other than Real Time also were served

25

26    [17] In the State Action, the parties also dispute whether Daulat is a bona fide purchaser of
27    the Valadez Property, see Real Time MSJ at 15:8 to 16:8, Daulat MSJ Opposition at 14:6-26,
      Daulat MSJ Reply at 14:22 to 15:15, and whether Daulat is equitably subrogated to the senior
28    lien rights of Wells Fargo.  See Daulat MSJ Opposition at 15:1 to 17:7; Daulat MSJ Reply at
      15:16 to 17:22.

by regular mail, and that various attorneys and the UST were served by the ECF system.  Under

Local Rule 5005(c)(4), electronic service of notice to an attorney does not constitute service on

the client unless the attorney is authorized to accept service by the client.  Likewise, under Local

Rule 5005(e)(4), an attorney's waiver of any right to receive notice by first class mail or personal

service does not constitute an agreement to accept service or notice on behalf of a client.  Under

these circumstances, it is questionable whether Real Time ever received adequate or perhaps

even any prior notice of the Valuation Motion.[18]

      Fourth, the Post-Conversion Schedules filed by the Debtor lists the Debtor's assets and

liabilities as of January 13, 2014.  In his amended Schedule "A," Debtor attests that he continues

to have an interest in the Valadez Property.  In his amended Schedule "D," Debtor attests that

Wells Fargo has a claim in the amount of $1,343,387 secured by the Valadez Property, that Real

Time has a claim in the amount of $449,861 secured by the Valadez Property, and that Bank of

America has a claim in the amount of $459,860 secured by the Valadez Property.  In his

amended Schedule "F," Debtor does not list Real Time, Bank of America, or Wells Fargo as

having unsecured claims for any deficiency.  Because the Debtor attested that Real Time

continued to be secured by the Valadez Property even after entry of the Valuation Order, he

would be judicially estopped from asserting an inconsistent position.  See New Hampshire v.

---

[18] The Valuation Motion sought relief only as to Real Time even though for some reason the proof of claim filed by Wells Fargo was attached, but the Real Time POC was not.  The Service Certificate does not reflect that the Valuation Motion and Hearing Notice were sent to the Dallas address set forth in the Real Time POC.  Nor does the Service Certificate reflect that the Valuation Motion and Hearing Notice were sent to the same Dallas address for Real Time set forth in the Debtor's Schedule "D."  As a result, the attorney's certification under Local Rule 9021(c) that accompanied submission of the proposed Valuation Order, see note 6, supra, was improper.  Under FRCP 60(b)(4), relief may be obtained by a party in interest from orders or judgments that are void.  Under FRCP 60(c)(1), a motion under FRCP 60(b)(4) must be made within a reasonable time rather than within one year as required for motions brought under FRCP 60(b)(1, 2, or 3).  According to the Grant, Bargain, Sale Deed, title to the Valadez Property was transferred by the Villa Roma Trust to Daulat on March 14, 2016.  According to the State Docket, Daulat commenced the State Action on October 20, 2017.  If the Service Certificate accurately reflects the notice given for the Valuation Motion, and unless there is evidence that attorneys listed in the Service Certificate represented Real Time in the Debtor's bankruptcy proceeding, a request for relief from the Valuation Order under FRCP 60(b)(4) might be both timely and appropriate.

1    <u>Maine</u>, 121 S.Ct. 1808, 1814 (2001) ("[W]here a party assumes a certain position in a legal

2    proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his

3    interests have changed, assume a contrary position, especially if it be to the prejudice of the party

4    who has acquiesced in the position formerly taken by him.").

5        <u>Fifth</u>, the TFR filed by the Trustee lists the assets of the Chapter 7 estate as of the

6    completion of the administration of the estate as well as the claims against the estate.  The

7    Trustee reported that Real Time's claim was secured by the Valadez Property and would not be

8    eligible to receive a distribution under Section 726.  <u>See</u> TFR, Claims Register, Claim 1.

9    Additionally, the TDR filed by the Trustee characterized Real Time's claim as a secured claim,

10   <u>see</u> TDR, Exhibit 3, and not as an unsecured claim.  <u>See</u> TDR, Exhibit 7.  Because the Trustee

11   certified that Real Time's claim was secured by the Valadez Property, that Real Time was

12   ineligible for a distribution, and that Real Time did not have an unsecured claim, the Trustee also

13   would be judicially estopped from asserting an inconsistent position.  <u>Compare</u> <u>In re Leonis</u>,

14   2017 WL 2492528, at *4 (B.A.P. 9th Cir. June 8, 2017), <u>quoting</u> <u>Lopez-Stubbe v. Rodriguez-</u>

15   <u>Estrada (In re San Juan Hotel Corp.)</u>, 847 F.2d 931, 939 (1st Cir. 1988) ("The very purpose of a

16   final accounting is to insure that trustees disclose and be held accountable for the handling of the

17   estate.").

18       <u>Sixth</u>, the language of the Valuation Order is poorly drafted, ambiguous at best, and

19   requires this court's resolution of the competing interpretations offered by the parties.[19]  There is

20   _____

21       [19] An even more obvious disconnect appears when comparing the prayer of the Valuation
     Motion and the prefatory paragraph of the Valuation Order itself.  The prayer of the Valuation

22   Motion contains three requests: (1) a finding that <u>Real Time Resolutions</u> is not a holder of a
     secured lien, (2) to avoid "strip off" and extinguish <u>Real Time Resolutions</u> wholly unsecured

23   second lien, and (3) to reclassify <u>Real Time Resolutions</u> claim to be paid pro rata with other
     general unsecured creditors through the Debtor's Chapter 11 plan.  <u>See</u> Valuation Motion at 6:15

24   to 7:5 (emphasis added).  The prefatory paragraph of the Valuation Order, however, states as
     follows: "Upon the Motion ("Motion") of RAFAEL MIRCHOU ("Debtor") to Value Collateral,

25   "Strip Off" and <u>Modify Rights of WELLS FARGO BANK, NA, Account No. xxxxx8584, (First</u>
     <u>Mortgage and/or First Deed of Trust ("Creditor") pursuant to 11 U.S.C. §506(a) and §1123</u> with

26   regard to its partially unsecured first mortgage on Debtor's real property located at 2021
     S.Valadez St., Las Vegas, Nevada 89117 ("Subject Property");</u> and a hearing having been held

27   before this Court . . . , and due notice of the Motion and the Hearing of the Motion having been
     given to all parties entitled thereto . . . "  Valuation Order at 1:22 to 2:4 (emphasis added).  The

28

1   no dispute that Real Time's claim is based on its rights under a prepetition agreement where the

2   Debtor gave the lender a lien against the Valadez Property to secure repayment of a loan. The

3   property rights of the Debtor and the lender were governed by state law. See Butner v. United

4   States, 440 U.S. 48, 55 (1979). Under bankruptcy law, liens in favor of a creditor pass through

5   the bankruptcy estate even if the debtor's personal liability for the debt is discharged. 11 U.S.C.

6   § 524(a)(1). See Long v. Bullard, 117 U.S. 617, 621 (1886); Abet Justice LLC v. First Am.

7   Trustee Serv. Solutions, LLC, 237 F. Supp.3d 1059, 1063 (D. Nev. 2017). In other words, the

8   creditor may not continue to pursue enforcement of its in personam claim under state law against

9   the debtor as a personal liability, but may continue to enforce its in rem rights under state law

10  created by the lien against the property. See Johnson v. Home State Bank, 501 U.S. 78, 84

11  (1991); Ocwen Loan Serv., LLC v. Marino (In re Marino), 577 B.R. 772, 784-785 (B.A.P. 9th

12  Cir. 2017).

13       Bankruptcy law also permits the lien rights of a creditor to be altered under certain

14  circumstances. Liens can be avoided for the benefit of the bankruptcy estate if they result from

15  fraudulent transfers under Sections 544 and 548, unperfected or unenforceable statutory liens

16  under Section 545, preferential transfers under Section 547, unauthorized postpetition transfers

17  under Section 549, and penalty, forfeiture or punitive damage claims under Section 724(a).

18  Compare Butner, 440 U.S. at 54 & n.8. Liens also can be avoided for the benefit of a debtor

19  rather than the bankruptcy estate. For example, Section 522(f) permits a debtor to seek to avoid

20  certain liens that impair an individual debtor's exemption of certain property. 11 U.S.C. §

21  522(f)(1) [judicial liens] and § 522(f)(2) [non-purchase money, non-possessory security interests

22  in certain personal property]. Additionally, Section 522(g) permits a debtor to claim an

23  exemption in involuntarily transferred property in which creditor liens have been avoided by the

24  trustee. 11 U.S.C. § 522(g)(1).

25       Section 506(d) also provides that "[to] the extent that a lien secures a claim against the

26

27       same order was attached to the Valuation Motion as the order proposed by the Debtor. It is not
         clear that any party in interest reading the Valuation Order would know that the Debtor's
28       Valuation Motion was seeking relief as to any creditor other than Wells Fargo.

debtor that is not an allowed secured claim, such lien is void . . . "  11 U.S.C. § 506(d).  The Supreme Court has rejected, however, any suggestion that Section 506(d) allows an individual Chapter 7 debtor to void a lien on real property simply because the secured creditor does not have an allowed secured claim under Section 506(a).  See Dewsnup v. Timm, 502 U.S. 410, 419-20 (1992).[20]  Additionally, the Supreme Court concluded more recently that an individual Chapter 7 debtor cannot void a lien on real property on the basis that the claim of the junior lienholder is wholly unsecured by the real property.  See Bank of Am., N.A. v. Caulkett, 575 U.S. ___, 135 S.Ct. 1995, 1999-2001 (2015).[21]

The Court in Dewsnup recognized that Congress has treated reorganizations in bankruptcy differently than liquidations through bankruptcy.  502 U.S. at 779 ("Apart from reorganization proceedings . . . , no provision of the pre-Code statute permitted involuntary reduction of the amount of a creditor's lien for any reason other than payment of the debt.").[22]  Those differences from Chapter 7 are found in the "cramdown" provisions of Chapter 11 and Chapter 13.

---

[20] In Dewsnup, the individual debtor owned farm land that was encumbered by a deed of trust in favor of a lender.  The loan balance exceeded the fair market value of the farmland.  The individual debtor filed a voluntary Chapter 7 petition that stayed the lender's foreclosure sale. The debtor could not seek to redeem the farm land under Section 722 by paying the fair market value to the lender because Section 722 only applies to personal property.  So, instead, the debtor alleged that under Section 506(a), the lender's claim was allowed only up to the fair market value of the farm land, and the secured claim therefore was void under the language of Section 506(d).

[21] Instead, the debtor or other party in interest is required to obtain an order disallowing the secured claim itself, upon which determination the claimant's lien will be void by operation of Section 506(d).  See Caulkett, 135 S.Ct. at 1999; Dewsnup, 502 U.S. 415-416.

[22] The "pre-Code" provisions referenced by the Supreme Court consisted of the section of the bankruptcy statute setting forth the permissible provisions of a plan of reorganization.  See 11 U.S.C. § 616 (1976 ed.), reprinted, A Collier on Bankruptcy Sec. 216 (16th 2018).  Under then-Section 616(1), a proposed plan of reorganization "shall include in respect to creditors generally or some class of them, secured or unsecured, . . . provisions altering or modifying their rights, either through the issuance of new securities of any character or otherwise."  Additionally, under then-Section 616(10), a proposed plan "shall provide adequate means for the execution of the plan, which may include: . . . the satisfaction or modification of liens . . ." (Emphasis added.)

In a Chapter 11 reorganization proceeding, an individual debtor's proposed plan may include a provision to "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence . . . " 11 U.S.C. § 1123(b)(5). Modification of a creditor's rights results in an impairment of the creditor's claim under Section 1124(1), thereby requiring the Chapter 11 plan proponent to solicit acceptance of the plan from that creditor. See 11 U.S.C. § 1126(f). To be confirmed, the proposed Chapter 11 plan must provide one of three possible treatments of a creditor whose claim is secured by property: [1] the plan must provide (a) for the creditor to retain its lien against the subject property, and (b) for the allowed amount of the creditor's claim[23] to be paid in deferred cash payments; or, [2] the plan must provide for the subject property to be sold and the secured creditor's lien to attach to the proceeds of sale; or [3] the plan must provide for the secured creditor to receive the indubitable equivalent of its claim. See 11 U.S.C. § 1129(b)(2)(A).

Cramdown occurs in Chapter 11 when the secured creditor's rights are altered by the plan under Section 1124 and the proposed Chapter 11 plan is confirmed as "fair and equitable" under Section 1129(b)(2)(A) even though the secured creditor does not accept the proposed plan treatment. Under Section 1141(a), a confirmed Chapter 11 plan is binding on creditors and other parties in interest regardless of whether they accepted the plan.[24] Additionally, under Section 1141(b), a confirmed plan vests all of the property of the estate in the debtor, and under Section 1141(c), " . . . the property dealt with by the plan is free and clear of all claims and interests of

---

[23] Under Section 506(a), the allowed amount of a secured creditor's claim is equal to the value of the property securing the claim. Any remaining portion of the secured creditor's claim is allowed as unsecured. 11 U.S.C. § 506(a)(1) ("An allowed claim of a creditor secured by a lien . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest...is less than the amount of such allowed claim.")

[24] Only Congress has authority to establish "uniform Laws on the subject of Bankruptcies throughout the United States." U.S. CONST. art. I, § 8, cl. 4. States are prohibited from passing any "Law impairing the Obligation of Contracts . . . " Id., art. I, § 10, cl. 1. Congress is expressly authorized to enact the bankruptcy provisions that include cramdown treatments altering the contractual rights of dissenting creditors, even though individual States may be precluded from enacting similar laws.

creditors, equity security holders, and of general partners of the debtor." For an individual Chapter 11 debtor, however, a discharge of his or her personal liability for the debts specified in the confirmed plan does not occur until the bankruptcy court grants a discharge on completion of all payments under the plan. See 11 U.S.C. § 1141(d)(5)(A).

In a Chapter 13 reorganization, an individual debtor's proposed plan also may include a provision to "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence . . . " 11 U.S.C. § 1322(b)(2).[25] To be confirmed, the proposed Chapter 13 plan must provide one of three possible treatments of a creditor secured by real property: [1] the plan must provide a treatment that is accepted by the holder of the secured claim; or, [2] the plan must provide (a) for the creditor to retain its lien against the real property until the debt is fully paid or the debtor receives a Chapter 13 discharge; (b) for the allowed amount of the creditor's claim to be paid over the life of the plan; and (c) any monthly installment payments of the allowed amount to be made in equal installments; or [3] the plan must surrender the property to the creditor.[26] See 11 U.S.C. § 1325(a)(5).

Cramdown occurs in Chapter 13 when the secured creditor does not accept the treatment proposed in the Chapter 13 plan and the property is not surrendered by the debtor, thereby permitting the debtor to retain the subject property only by paying the creditor the current value

---

[25] The "anti-modification" language with respect to a debtor's principal residence does not apply to junior liens for which there is no value in the residence beyond the amount of the senior lien. Under that circumstance, the junior lien is "wholly-unsecured" and is not an allowed secured claim within the meaning of Section 506(a). Accordingly, modification of the rights of a wholly unsecured creditor's otherwise secured claim is permissible under Section 1322(b)(2). See Zimmer v. PSB Lending Corp. (In re Zimmer), 313 F.3d 1220 (9th Cir. 2002).

[26] Unlike Chapter 13, surrender of the subject collateral is not one of the specified alternatives for fair and equitable treatment of a secured claim under Section 1129(b)(2)(A). However, surrender of all or portions of a secured creditor's collateral may be used as a method of providing the "indubitable equivalent" of the allowed amount of a secured claim. See, e.g., Arnold & Baker Farms v. United States (In re Arnold & Baker Farms), 85 F.3d 1415 (9th Cir. 1996), cert. denied, 519 U.S. 1054 (1997) (denying confirmation of plan where evidence did not support finding that replacement real property collateral provided indubitable equivalent of allowed secured claim).

1   of the property (plus a pro rata portion of any amounts that are distributed to general unsecured

2   creditors).  Under Section 1327(a), a confirmed Chapter 13 plan is binding on the creditors

3   regardless of whether they objected to, accepted, or rejected the plan.  Under Section 1327(b),

4   confirmation of a Chapter 13 plan also vests all property of the estate in the debtor, and under

5   Section 1327(c), the vesting of property in the debtor "is free and clear of any claim or interest of

6   any creditor provided for by the plan."  Like an individual Chapter 11 debtor, however, a

7   Chapter 13 debtor's discharge of his or her personal liability for the debts specified in the

8   confirmed plan does not occur until the bankruptcy court grants a discharge upon completion of

9   all payments under the plan.  See 11 U.S.C. § 1328(a).

10      Neither Daulat nor Real Time suggest that the rights under the Real Time POC were

11  somehow avoided after the Debtor's case was converted to Chapter 7.  The docket of the

12  bankruptcy case discloses no effort by the Trustee to avoid the Real Time DOT under Sections

13  544, 545, 547, 548, 549, or 724(a).  Likewise, the record discloses no efforts by the Debtor to

14  avoid the lien created by the Real Time DOT as impairing an exemption available under Section

15  522.[27]  Finally, the record discloses that no party in interest objected to the Real Time POC at

16  any time during the Debtor's Chapter 7 proceeding.  As a result, the Real Time POC was deemed

17  allowed under Section 502(a) and therefore, under Dewsnup and Caulkett, was not void under

18  Section 506(d).

19      Likewise, neither Daulat nor Real Time suggests that the Debtor took steps during the

20  Chapter 11 proceeding to avoid the Real Time DOT under Sections 544, 545, 547, 548, 549, or

21  724(a).  Neither dispute that while he was in Chapter 11, Debtor was a debtor in possession who

22  had all of the avoiding powers of a bankruptcy trustee.  See 11 U.S.C. § 1107(a).  Likewise, the

23  record discloses no efforts by the Debtor during the Chapter 11 to avoid the lien created by the

24

25      [27] In his pre-conversion Schedules and amended Schedules, Debtor never claimed an

26  exemption in the Valadez Property.  In his Post-Conversion Schedules, Debtor also did not claim
    an exemption in the Valadez Property.  As the Real Time DOT was not a judicial lien, avoidance

27  under Section 522(f)(1)(A) was not available.  As the Real Time DOT did not create a
    nonpossessory, nonpurchase money security interest in personal property, avoidance under

28  Section 522(f)(1)(B) also was not available.

Real Time DOT as impairing an exemption available under Section 522. Finally, the record discloses that neither the Debtor nor any other party in interest objected to the Real Time POC at any time during the Chapter 11 proceeding. As a result, the Real Time POC was deemed allowed under Section 502(a) during the Chapter 11 proceeding and the lien created by the Real Time DOT, therefore, was not void under Section 506(d).

The only remaining question is whether the Debtor otherwise achieved an avoidance of the Real Time DOT while he was attempting reorganization under Chapter 11. Clearly he did not. The record reflects that none of the Chapter 11 plans proposed by the Debtor included a so-called "lien strip" of Real Time's secured claim. Debtor's original Proposed Plan provided for the Valadez Property to be sold at a short sale, rather than being retained by the Debtor sans the Real Time junior lien. See discussion at 3, supra. Debtor's Second Proposed Plan provided for the Valadez Property to be surrendered to Wells Fargo in full satisfaction of Wells Fargo's secured claim, rather than being retained by the Debtor. See discussion at 5, supra. Debtor's Third Proposed Plan also provided for the Valadez Property to be surrendered to Wells Fargo in full satisfaction of Wells Fargo's secured claim, rather than being retained by the Debtor. See discussion at 6, supra. Debtor's Fourth (and last) Proposed Plan also provided for the Valadez Property to be surrendered, apparently to his former wife, rather than being retained by the Debtor. See discussion at 6-7, supra. Nowhere in any of the Debtor's proposed Chapter 11 plans did he propose to void Real Time's lien against the Valadez Property, nor did any of the proposed plans subsequent to the entry of the Valuation Order incorporate by reference any of the terms of the Valuation Order.

Elimination of Real Time's lien through a proposed plan of reorganization would have been an alteration of Real Time's rights under its deed of trust, thereby giving Real Time an impaired claim under Section 1124. As previously discussed at 17, supra, Debtor would have been required to solicit Real Time's acceptance of his proposed Chapter 11 plan. Real Time could have rejected its treatment under the proposed plan, thereby requiring Debtor to meet the cramdown requirements for plan confirmation under Section 1129(b), including the "fair and equitable treatment" of Real Time's claim. See 11 U.S.C. § 1129(b)(1). Real Time also could

have objected to plan confirmation, thereby requiring the Debtor to either pay all of the

unsecured portion of Real Time's claim in full, or, to pay all of the Debtor's projected disposable

income over at least five years.  See 11 U.S.C. § 1129(a)(15).[28]  In short, Debtor took none of the

steps required in the bankruptcy reorganization process contemplated by Dewsnup to permit "an

involuntary reduction of the amount of a creditor's lien for any reason other than payment on the

debt."  502 U.S. at 419.  It is not surprising then that even the Debtor recognized that Real

Time's claim was still secured by the Valadez Property when he filed his Post-Conversion

Schedules.

The Valuation Order contemplated that any final benefit received by the Debtor was

conditioned upon completion of a Chapter 11 plan and his receipt of a discharge.  This was

consistent with the requirements for an individual to obtain a discharge in Chapter 11.  See 11

U.S.C. § 1141(d)(5).  That such benefit would include an "avoidance, strip off, extinguishment,

or termination" of Real Time's rights under its deed of trust, see discussion at 5, supra, is

appropriate because no part of its claim was secured under Section 506(a), and its allowed

unsecured claim would be discharged upon completion of a Chapter 11 plan.  That legal result

would have occurred after discharge regardless of the effective date of the Valuation Order.[29]

That the Debtor failed to confirm a Chapter 11 plan and failed to obtain a Chapter 11

---

[28] If Real Time's secured claim was wholly unsecured, then the full amount of its proof of claim, i.e., $489,543.73, would have been the allowed unsecured claim that the Debtor would have had to pay in full to satisfy the first option under Section 1129(a)(15).  Debtor's other option under Section 1129(a)(15) would have been to pay all of his projected disposable income over a five year period.  According to the cash flow projection attached as Exhibit "D" to the Debtor's last proposed Chapter 11 disclosure statement, see SAD at 48-49, the Debtor's disposable income each month over various periods ranged from $4,916 to $6,401.

[29] The court places little stock in the last paragraph of the Valuation Order stating that "it is further **ORDERED** that as provided by Fed.R.Bankr. P. 7062, this Order shall be effective and enforceable immediately upon entry."  FRBP 7062 applies only in adversary proceedings commenced under FRBP 7001, and not contested matters brought under FRBP 9014.  The Valuation Motion was a contested matter.  Moreover, the language in the Valuation Order submitted by Debtor's bankruptcy counsel also was a misstatement of FRBP 7062.  FRBP 7062 states that FRCP 62 applies in adversary proceedings.  In turn, FRCP 62(a) provides that there shall be no execution of a judgment until after 14 days have passed.  In other words, unless the court orders otherwise, a judgment is not effective and not enforceable immediately upon entry.

1  discharge did not prevent him from subsequently attempting to "strip" Real Time's lien through

2  another bankruptcy reorganization.  As previously discussed, the Chapter 7 discharge relieved

3  the Debtor of his personal liability for his prebankruptcy debts, but did not affect the liens.

4  Debtor originally filed his Chapter 11 petition on September 28, 2010.  The conversion of his

5  Chapter 11 proceeding to Chapter 7 related back to the petition date.  See 11 U.S.C. § 348(a).

6  A debtor is barred from obtaining another Chapter 7 discharge for eight years from the

7  commencement of the debtor's previous Chapter 7 proceeding.  See 11 U.S.C. § 727(a)(8).[30]

8  A debtor also may obtain a discharge through Chapter 13, if the Chapter 13 proceeding is

9  commenced at least four years from the commencement of the previous Chapter 7 proceeding.

10 See 11 U.S.C. § 1328(f)(1).[31]

11      But in this district, it has long been recognized that "lien stripping" may occur through

12 Chapter 13 after an individual debtor receives a Chapter 7 discharge even if the debtor is not

13 eligible to receive a Chapter 13 discharge.  See In re Okosisi, 451 B.R. 90 (Bankr. D. Nev.

14 2011).  Because the instant Debtor discharged his personal liability for all or most of his debts

15 that existed when he filed his prior Chapter 11 petition, he likely would have met the unsecured

16 and secured debt limits to qualify for a Chapter 13 proceeding right after he received his Chapter

17 7 discharge on June 14, 2014.  See 11 U.S.C. § 109(e) [Chapter 13 debtor must be an individual

18 with regular income that owes noncontingent, liquidated unsecured debts of less than $394,725,

19 and noncontingent, liquidated secured debts of less than $1,184,200].[32]  As in Okosisi, the

20 Debtor could have filed a proposed Chapter 13 plan and included a provision that voided Real

21 Time's lien upon completion of the plan, see Okosisi, 451 B.R. at 92, irrespective of whether any

22

23      [30] In this instance, the Debtor cannot seek another Chapter 7 discharge until September
    29, 2018.

24

25      [31] The permissibility of filing a Chapter 13 after obtaining a discharge through Chapter
    7 was expressly recognized by the Court in Johnson v. Home State Bank, Sol U.S. 78 (1991) and

26 is commonly known as a "Chapter 20" proceeding.  See generally KEITH M. LUNDIN & WILLIAM
    H. BROWN, CHAPTER 13 BANKRUPTCY, 4TH ED., § 19.2, at ¶ [2], Sec. Rev. Mar. 6, 2009,

27 www.Ch13online.com.

28      [32] These debt limit amounts went into effect on April 1, 2016.  As of April 1, 2013, the
    unsecured and secured debt limits were $383,175 and $1,149,525, respectively.

remaining obligation to Real Time was discharged in Chapter 13.  Id. at 94-100.[33]  See also

Frazier v. Real Time Resolutions, Inc., 469 B.R. 889, 895-96 (E.D. Cal. 2012) (discussing three

approaches to lien stripping in Chapter 13 without discharge and affirming confirmation of

Chapter 13 plan that permanently stripped wholly unsecured lien upon plan completion).[34]  After

Okosisi was decided, both the Bankruptcy Appellate Panel for this circuit, as well as the Ninth

Circuit Court of Appeals, also concluded that permanent lien avoidance may be obtained through

completion of a Chapter 13 plan even if the individual debtors are not eligible for a Chapter 13

discharge.  See HSBC Bank USA, N.A. v. Blendheim (In re Blendheim), 803 F.3d 477, 497 (9th

Cir. 2015); Boukatch v. Midfirst Bank  (In re Boukatch), 533 B.R. 292, 295 (B.A.P. 9th Cir.

2015).  In the instant case, however, the Debtor did not obtain further relief from the Real Time

DOT through reorganization under Chapter 13, nor under Chapter 11.[35]

---

[33] As the court in Okosisi explained, a confirmed Chapter 13 plan is binding on the debtor
and all creditors.  Additionally, confirmation of a Chapter 13 plan vests all property of the estate
in the debtor free and clear of any interest of any creditor, including any liens on real property.
451 B.R. at 100.  An order confirming a Chapter 13 plan is a final judgment, see United Student
Aid Funds, Inc. v. Espinosa, 559 U.S. 260, 269 (2010), and not subject to collateral attack.  Liens
avoided under a confirmed Chapter 13 plan therefore remain avoided as long as the confirmation
order remains in effect.  See Okosisi, 451 B.R. at 100.  Once all payments under the confirmed
plan are completed, the Chapter 13 case will be closed and the res judicata effect of the
confirmed plan will remain in place.  Id.

[34] In Frazier, the local Chapter 13 plan form for the Eastern District of California
included a motion to value a creditor's collateral as well as a motion to avoid liens.  The
apparent purpose of including such motions as part of the form Chapter 13 plan is to ensure that
the purpose of such motions, i.e., to "strip" liens through a proposed plan, is not separated from
the plan itself.  Presumably, the incidence of rogue orders that strip liens without a proposed
Chapter 13 plan is minimized in such districts.

[35] The circuit panel in Blendheim viewed Chapters 7 and 13 as the chapters designed to
give bankruptcy relief exclusively to individual debtors.  803 F.3d at 485.  The observation is
correct, of course, but individual debtors also may obtain bankruptcy relief through Chapter 11.
The amendments to the Bankruptcy Code enacted in 2005 through the Bankruptcy Abuse
Prevention and Consumer Protection Act ("BAPCPA") included a variety of provisions designed
to make individual reorganizations through Chapter 11 more akin to individual debt adjustments
through Chapter 13.  See In re Shat, 424 B.R. 854, 862 (Bankr. D. Nev. 2010), abrogated on
other grounds, Zachary v. California Bank & Trust (In re Zachary), 811 F.3d 1191 (9th Cir.
2016).  If a Chapter 11 individual debtor would otherwise be ineligible for a Chapter 11
discharge, see, e.g., 11 U.S.C. § 1141(d)(3)(C) and 8 COLLIER ON BANKRUPTCY, ¶ 1141.05[4]

1   Rather, the Debtor did not propose a Chapter 11 plan that provided for the Real Time

2   DOT to be avoided.  The Debtor did not confirm a Chapter 11 plan that provided for the Real

3   Time DOT to be avoided.  The Debtor did not complete a Chapter 11 plan that provided for the

4   Real Time DOT to be avoided.  The Debtor did not obtain a Chapter 11 discharge.  Additionally,

5   the Trustee did not avoid the Real Time DOT.  The Debtor did not avoid the Real Time DOT.

6   Moreover, no one objected to allowance of the Real Time POC.  As a result, the Debtor obtained

7   a Chapter 7 discharge of his personal liability, but the Real Time lien passed through the

8   Debtor's bankruptcy under well-established law.  See discussion at 15, supra.  See also Owen v.

9   Owen, 500 U.S. 305, 308-309 (1991); Farrey v. Sanderfoot, 500 U.S. 291, 297 (1991).

10  Based on the foregoing, the court concludes that cause exists under Section 350 to reopen

11  the instant bankruptcy case.  Additionally, the court concludes that the Valuation Order did not

12  avoid, strip off, extinguish, terminate, or in any way modify the rights of Real Time under its

13  deed of trust against the Valadez Property.

14  **IT IS THEREFORE ORDERED** that the Motion to Reopen Bankruptcy Case Pursuant

15  to Federal Rule of Bankruptcy 5010, Docket No. 533, be, and the same hereby is, **GRANTED**.

16  **IT IS FURTHER ORDERED** that the Order Granting Motion to Value Collateral,

17  "Strip Off" and Modify Rights of Secured Creditors Pursuant to 11 U.S.C. § 506(a) and §1123,

18  entered September 13, 2012, Docket No. 240, is interpreted, construed, and clarified as set forth

19  in the present Order.

20  **IT IS FURTHER ORDERED** that the moving parties shall file a copy of this Order in

21  the civil action styled as Jaldeep Daulat v. RRA CP Opportunity Trust 1, et al., Case No. A-17-

22  763408-C, pending in the Eighth Judicial District Court, Clark County, Nevada.

23  / / / /

24  _____

25  (Alan N. Resnick & Henry J. Sommer, eds.,16th ed. rev. 2017), the question is whether the
    individual debtor still could obtain a lien avoidance by completing a confirmed Chapter 11 plan.

26  The decisions in Okosisi, Frazier, Blendheim, and Boukatch do not address that question, but
    prior to the enactment of BAPCPA, the Bankruptcy Appellate Panel for this circuit recognized

27  that individuals could strip liens against real property through the Chapter 11 cramdown process.

28  See First Fed. Bank of California v. Weinstein (In re Weinstein), 227 B.R. 284, 292 n.8 (B.A.P.
    9th Cir. 1998).

24

1    **IT IS FURTHER ORDERED** that the above-captioned case shall be **RE-CLOSED**

2  thirty days after entry of this order, unless otherwise ordered by this court.

3

4  Copies sent to all parties via CM/ECF ELECTRONIC FILING

5  Copies sent to all parties via BNC

6

7                                      # # #

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28